UNITED STATES of America, Plaintiff,

v.

David FRIEDLAND and Jacob Friedland, Defendants.

Crim. No. 79–346.

United States District Court,
D. New Jersey.

Dec. 10, 1980.

Donald A. Robinson, Newark, N. J. (Court–appointed), for plaintiff, in opposition to the motion.

Brown & Brown by Raymond M. Brown, Jersey City, N. J., for defendant David Friedland, in support of motion.

Podvey & Sachs by Franklin M. Sachs, Newark, N. J., for defendant Jacob Friedland, in support of motion.

## OPINION

MEANOR, District Judge.

This is a motion by defendants, members of the bar of this court and members of the New Jersey bar, to vacate an order temporarily suspending them from the practice of law in this court. The suspensions were imposed following the imposition of sentence as a consequence of each having been convicted of the commission of seven federal felonies.[1]

Defendants were named in seven counts each of a nine count indictment returned in this court on January 28, 1980. Count I charged them with engaging in a conspiracy, in violation of 18 U.S.C. § 371, to violate 18 U.S.C. § 1954. The gist of the charge was that they conspired with one Barry Marlin and others to take "kickbacks" in connection with loans from Team-sters Local 701 Pension Fund (Pension Fund), of which they were counsel. Count II charged that defendants had accepted from Barry Marlin a "kickback" of $315,000 in connection with a loan of $3.5 million made by the Pension Fund to an enterprise controlled by Marlin. Count III charged the receipt of a "kickback" of $45,000 in connection with a similar loan of $500,000. Since the payoff of $315,000 as charged in Count II had taken place in the Bahamas, Count IV charged a violation of the Travel Act, 18 U.S.C. § 1952, in that David Friedland traveled there to receive $315,000 in currency. Count V was predicated upon a violation of 18 U.S.C. § 1503 in that the defendants attempted to obstruct justice by suborning perjury by one Kate Edelman, estranged wife of Barry Marlin, before a United States Grand Jury.

Counts VI and VII charged David and Jacob Friedland, respectively, with violating 26 U.S.C. § 7206(1) in that they each filed a false and fraudulent income tax return for the calendar year 1975, omitting to state therein the receipt of a total of $360,000 as "kickback" income from Barry Marlin during that year.

Counts VIII and IX also alleged the commission of crime in violation of 26 U.S.C. § 7206(1). It appeared that the defendants in 1975 maintained a joint Swiss bank account with a balance of $1,050,000. In that year, in an effort to obtain greater interest, this money was moved into two certificates of deposit of $525,000 each issued by two different London banks, and held in the name of a bank chartered in the Grand Cayman Islands which was controlled by Marlin. When the immense fraudulent empire constructed by Marlin appeared to be collapsing in 1976, these certificates of deposit were broken prematurely and the funds returned to the Swiss account, with an additional $60,000. Presumably this sum represented earned interest on the certificates, and the crimes charged in Counts VIII and IX were that

---

1. David Friedland, age 42, was sentenced to a total term of seven years' imprisonment and fined a total of $35,000. Jacob Friedland, age 79, was sentenced to confinement for two years with five years of probation to follow and was also fined a total of $35,000.

their 1976 income tax returns were filed without showing the receipt of this earned interest as income for that year.

As will be discussed below, it has been the practice in this court since 1975 to suspend upon sentence any attorney convicted of a federal crime who is a member of the bar of this court. The suspension is until further order of the court pending the conclusion of disciplinary proceedings arising out of the conviction or the facts underlying it. Normally, an attorney defendant is informed upon the acceptance of a guilty plea or the rendition of a guilty verdict that suspension will follow immediately upon sentence. In this case, the courtroom scene following the discharge of the jury was rather emotionally charged, and I did not make the usual announcement at that time. Instead, I sent counsel a letter, dated April 11, 1980, the contents of which are set forth below, informing them that their clients would be suspended after imposition of sentence.[2] Accordingly, orders were entered June 6, 1980, by Chief Judge Fisher suspending each defendant from the practice of law in this court "until further order of the court."

Since defendants are members of the New Jersey bar, this court, as is its usual practice in cases involving the conviction of an attorney, notified the Administrative Office of the New Jersey Courts of the convictions. The Disciplinary Review Board[3] then recommended to the New Jersey Supreme Court that the defendants be subjected to a correlative suspension from the New Jersey bar. My understanding is that the present motion grew out of events that transpired at oral argument before that court, and that the New Jersey Supreme Court intends to await the outcome of the motion to vacate this court's suspensions before taking action. It is clear that the

defendants are not greatly concerned over their inability to practice in this court, but desire strongly to preserve their right to practice before the New Jersey courts until the criminal proceedings and any disciplinary action arising therefrom finally have been concluded.

Defendants now make two basic attacks upon their suspensions. The primary argument is that it is beyond the power of this, or any court, to suspend temporarily on account of a conviction until exhaustion of appellate processes. The defendants have, of course, appealed their convictions and at this writing the government's brief is not yet due. The second line of attack is that the procedure that led to their suspensions deprived them of procedural due process and, in any event, was not in accord with the Local Rules of this court.

### I

Heavy reliance is placed on *In re Ming*, 469 F.2d 1352 (7th Cir. 1972). That case involved the *misdemeanor* convictions of an attorney for failing to file income tax returns for four consecutive years, in violation of 26 U.S.C. § 7203. Solely on the basis of the fact of those convictions, Ming was suspended from the practice of law by the United States District Court for the Northern District of Illinois. Ming appealed both his convictions, which were affirmed, *United States v. Ming*, 466 F.2d 1000 (7th Cir.), *cert. denied*, 409 U.S. 915, 93 S.Ct. 235, 34 L.Ed.2d 176, *rehearing denied*, 409 U.S. 1051, 93 S.Ct. 514, 34 L.Ed.2d 504 (1972), and his suspension from the practice of law. The Seventh Circuit reversed the order of suspension. The Court denied the power to suspend on account of a conviction until the conviction had become absolutely final through exhaustion of the appellate process. It said:

> I have also notified the Administrative Office of the New Jersey Courts of the convictions in this case and of the fact that the defendants will be suspended in this court following the imposition of sentence.

**2.** Please inform your clients of the following. Pursuant to a standing order of this court, it will be my obligation to suspend them from practice in this court following their sentence on May 27. Therefore, if they have any pending matters before this court, arrangements should be made promptly for substitute counsel.

**3.** *See* N.J.R. 1:20 *et seq.*

We do not, however, tie the hands of the district court so that it can never suspend a person until his conviction reaches finality. All we say is that if the conviction itself is to be used to show that the appellant actually committed the underlying acts which are of such a nature as to form the basis for disbarment or suspension that that conviction must have reached finality, at least to the extent of exhaustion of direct appeals. Since appellant has the possibility of filing for a writ of certiorari in the United States Supreme Court, we do not think that the affirmance of his criminal conviction by this court moots this point.

469 F.2d at 1354 (footnote omitted).

Since the convictions of Ming, in the view of the Court, could not be used to establish the facts on which suspension was based until appellate exhaustion, it followed that if Ming were to be suspended before finalization of his convictions, an independent hearing would be required to establish the facts upon which suspension was to be predicated. It is clear, however, that if the convictions alone could have formed a valid basis for suspension, a further hearing would have been superfluous.

*Ming* and the other decisions in accord with it[4] by no means exemplify a uniform pattern of judicial authority. Perhaps, the leading recent case at war with the *Ming* decision is *Mitchell v. Association of Bar of City of New York*, 40 N.Y.2d 153, 386 N.Y. S.2d 95, 351 N.E.2d 743 (1976). John N. Mitchell, a former Attorney General of the United States, was convicted in the United States District Court for the District of Columbia of conspiracy, obstruction of justice, two counts of making false declarations under oath before a Grand Jury, and perjury. While his appeal from these convictions was pending in the United States Court of Appeals for the District of Columbia, his name was stricken from the rolls of those authorized to practice before the courts of the State of New York. This action was taken solely because of Mitchell's federal convictions and he, like these defendants, contested the power of a court to suspend or disbar solely on the basis of felony convictions which had not been finalized by appellate exhaustion. A unanimous New York Court of Appeals held to the contrary. The Court posed the issue before it as follows:

The single issue raised on this appeal is whether it is constitutionally permissible to disbar an attorney when the sole predicate for such a disbarment, a conviction of a felony, is still subject to appellate review.

40 N.Y.2d at 155, 386 N.Y.S.2d at 96, 351 N.E.2d at 745.

In its analysis, the Court acknowledged that the requisites of procedural due process must be satisfied before an attorney may be excluded from practicing his profession. It pointed out, however, that when dealing with attorney discipline the primary concern is protection of the public. Balancing that concern against the right of a convicted attorney to continue in practice pending appeal, the Court emphatically concluded that the public interest presented the paramount consideration. It stated:

To permit a convicted felon to continue to appear in our courts and to continue to give advice and counsel would not "advance the ends of justice", but instead would invite scorn and disrespect for our rule of law.

*Id.* at 156, 386 N.Y.S.2d at 97, 351 N.E.2d at 745.

The Court then went on to hold that there was no constitutional infirmity in the disbarment of Mitchell solely on the basis of his federal felony convictions even though an appeal therefrom was pending, pointing out that "[a] strong presumption of regularity attaches to that judgment of conviction." *Id.* at 157, 386 N.Y.S.2d at 97, 351

---

4. The following have been cited by defendants as in agreement with *Ming* and in support of their thesis that a conviction cannot alone be the basis for suspension until appeals are exhausted: *People v. Treadwell*, 5 P. 686 (Cal. 1885); *In re Riccardi*, 189 P. 694 (Cal.1920), *rehearing denied; State ex rel. Larew v. Sale*, 188 Mo. 493, 87 S.W. 967 (Mo.1905); and *Louisiana State Bar Ass'n v. Ehmig*, 277 So.2d 137 (La.1973), *rehearing denied*.

N.E.2d at 746. There are other decisions in accord with the *Mitchell* holding.[5]

The American Bar Association Special Committee on the Evaluation of Disciplinary Enforcement has fully explicated the policy rationale for suspending an attorney from practice following a felony conviction on that basis alone. That Committee has written:

No single facet of disciplinary enforcement is more to blame for any lack of public confidence in the integrity of the bar than the policy that permits a convicted attorney to continue to practice [pending appeal] while apparently enjoying immunity from discipline. . . .

. . . . .

The consequences of permitting the convicted attorney to continue to practice are not limited to the adverse effect upon the reputation of the profession. The clients of the convicted attorney suffer also. One who is unaware of the conviction might retain the attorney and unwittingly compromise his rights. Adversary counsel aware of the conviction may be reluctant to negotiate with the attorney, to enter on a settlement with him, to entrust him with an escrow fund, or to be associated with him of counsel. These are all circumstances totally unrelated to the merits of the client's cause, and they may impair it. Moreover, the conviction may be affirmed and the attorney sent to prison while the new client's claim is pending. The client will then be forced to employ new counsel, who will have to familiarize himself with the matter. This means more delay and considerable duplication of expense to the client.

There is a further threat to the convicted attorney's client. The attorney, aware that the conviction ultimately will result in his disbarment, and, assuming that he has little to lose, he may engage in serious misconduct toward his remaining clients for his own personal gain.

A policy which thus jeopardizes the rights of innocent clients cannot be justified.

*Report of the Special Committee on Evaluation of Disciplinary Enforcement,* 95 ABA Reports 783, 920–21 (1970).[6]

No federal decision in accord with *Mitchell* and contrary to *Ming* has been cited to this court. Of extreme interest, however, is a portion of the Model Federal Rules of Disciplinary Enforcement, approved September 21, 1978, by the Judicial Conference of the United States and recommended for adoption on an optional basis by all federal trial and appellate courts. The portion of the recommended rules, entitled "Attorneys Convicted of Crimes", is set forth below.[7]

---

**5.** *See, e. g., Ex parte Alabama State Bar,* 285 Ala. 191, 230 So.2d 519 (1970), *rehearing denied; Williford v. State,* 56 Ga.App. 840, 194 S.E. 384 (1937), *rehearing denied; In re Kirby,* 10 S.D. 322, 73 N.W. 92 (1897), *on rehearing,* 10 S.D. 414, 73 N.W. 907 (1898), *rehearing denied.*

**6.** It is appropriate to note that in the area of disqualification because of conflicting interests regarding civil litigation the Third Circuit has recently emphasized the necessity of avoiding the appearance of impropriety. *IBM v. Levin,* 579 F.2d 271, 283 (3d Cir. 1978); *Akerly v. Red Barn System, Inc.,* 551 F.2d 539, 544 (3d Cir. 1977).

**7.** ATTORNEYS CONVICTED OF CRIMES

A. Upon the filing with this Court of a certified copy of a judgment of conviction demonstrating that any attorney admitted to practice before the Court has been convicted in any Court of the United States, or the District of Columbia, or of any state, territory, commonwealth or possession of the United States of a serious crime as hereinafter defined, the Court shall enter an order immediately suspending that attorney, whether the conviction resulted from a plea of guilty, or nolo contendere or from a verdict after trial or otherwise, and regardless of the pendency of any appeal, until final disposition of a disciplinary proceeding to be commenced upon such conviction. A copy of such order shall immediately be served upon the attorney. Upon good cause shown, the Court may set aside such order when it appears in the interest of justice to do so.

B. The term "serious crime" shall include any felony and any lesser crime a necessary element of which, as determined by the statutory or common law definition of such crime in the jurisdiction where the judgment was entered, involves false swearing, misrepresentation, fraud, willful failure to file income tax returns, deceit, bribery, extortion, misap-

■ It is apparent that there is ample and highly respectable authority in support of the thesis that a court constitutionally may suspend a member of its bar summarily on the basis of a felony conviction even though that conviction has not been finalized by completion of the appellate process. Hence, there is no constitutional interdiction against the adoption of such a policy by this court. As will be shown below, this court has already adopted that policy in implementation of its own disciplinary rules.[8]

## II

The Local Rules of this court do not precisely provide for the automatic suspension of an attorney convicted here of the commission of a federal felony. Local Rule 7 of this court is entitled "Discipline of Attorneys." Its relevant parts are set forth below.[9]

> propriation, theft, or an attempt or a conspiracy or solicitation of another to commit a "serious crime."
>
> C. A certified copy of a judgment of conviction of an attorney for any crime shall be conclusive evidence of the commission of that crime in any disciplinary proceeding instituted against that attorney based upon the conviction.
>
> D. Upon the filing of a certified copy of a judgment of conviction of an attorney for a serious crime, the Court shall in addition to suspending that attorney in accordance with the provisions of this Rule, also refer the matter to counsel for the institution of a disciplinary proceeding before the Court in which the sole issue to be determined shall be the extent of the final discipline to be imposed as a result of the conduct resulting in the conviction, provided that a disciplinary proceeding so instituted will not be brought to final hearing until all appeals from the conviction are concluded.
>
> E. Upon the filing of a certified copy of a judgment of conviction of an attorney for a crime not constituting a "serious crime," the Court may refer the matter to counsel for whatever action counsel may deem warranted, including the institution of a disciplinary proceeding before the Court; provided, however, that the Court may in its discretion make no reference with respect to convictions for minor offenses.
>
> F. An attorney suspended under the provisions of this Rule will be reinstated immediately upon the filing of a certificate demonstrating that the underlying conviction of a serious crime has been reversed but the reinstatement will not terminate any disciplinary proceeding then pending against the attorney, the disposition of which shall be determined by the Court on the basis of all available evidence pertaining to both guilt and the extent of discipline to be imposed.

Model Federal Rules of Disciplinary Enforcement Rule I (as approved by the Judicial Conference of the United States (Sept. 21, 1978)). I have been informed by the Administrative Office of the United States Courts that at least 21 district courts and three courts of appeals have adopted this Rule.

8. It should be obvious that if the conviction underlying the suspension is reversed, the suspension can no longer stand on that ground alone. *Cf.* Fed.R.Civ.P. 60(b)(5) (a final judgment may be set aside where "a prior judgment upon which it is based has been reversed or otherwise vacated, . . .").

It is also worth noting that on March 31, 1975, the Supreme Court entered an order suspending John N. Mitchell from the practice of law before it and issued an order to show cause why he should not be disbarred from the Supreme Court. *In re Mitchell*, 420 U.S. 1001, 95 S.Ct. 1442, 43 L.Ed.2d 759 (1975). This action took place following the striking of his name from the rolls by the New York Appellate Division, First Department, *In re Mitchell*, 48 App. Div.2d 410, 370 N.Y.S.2d 99 (App.Div.1975), *aff'd sub nom., Mitchell v. Ass'n of Bar of City of New York*, and before the affirmance of that action by the New York Court of Appeals in *Mitchell v. Ass'n of Bar of City of New York, supra.*

9. (2) The court may make an order in a disciplinary proceeding disbarring, suspending or censuring, or taking such other action as justice may require, with respect to a member of the bar of this court:

(a) Who has resigned from the bar of a court of any State, Territory, District, Commonwealth or Possession. [*sic*]

(b) Who has been disbarred, suspended from practice or censured in any State, Territory, District, Commonwealth or Possession;

(c) Who has been convicted of a crime involving moral turpitude in any State, Territory, District, Commonwealth or Possession;

. . .

. . . . .

(3) Proceedings within subdivisions (a), (b), and (c) of Paragraph 2 may be initiated by an order requiring the respondents to show cause within 30 days after service thereof on him, personally or by mail, why he should not be disciplined. Upon the issuance of such order the chief judge may, for good cause, temporarily suspend the respondent pending the termination of the proceedings. Upon the return of said order, if the respon-

The practice of automatically suspending a convicted attorney was established at a meeting of the judges of this court on April 23, 1975. The pertinent minutes of that meeting are repeated in the margin.[10]

The reference in the minutes to "State disciplinary proceedings" is to our usual practice in disciplinary matters of acting on the basis of the record upon which the New Jersey Supreme Court has acted. This subject is explored and explained fully in *In re Abrams*, 521 F.2d 1094 (3d Cir.), *cert. denied sub nom. United States District Court v. Abrams*, 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975). However, we have also determined that in cases where a member of the bar of this court is convicted in this court, we shall impose temporary suspension pending appeal. Thereafter, we may exercise our option to initiate final disciplinary action, or, as we usually do, wait for such final action to be taken by the New Jersey Supreme Court. Thereafter, we may act on the basis of the record before that court. *In re Abrams, supra.*

One reason that we have decided to suspend temporarily upon an attorney's conviction here is that the New Jersey Supreme Court historically has not taken such a step based on conviction alone, but has adopted the practice of awaiting exhaustion of appellate processes.[11] The matter of attorney discipline presents the most viable area of potential friction between this court and the highest court of New Jersey. These common problems have, however, been approached with a spirit of comity and deference and friction has been kept to a minimum. But despite our deep respect for the New Jersey Supreme Court we must depart from its views in this instance, for we find it intolerable that a convicted felon should be permitted to engage in the practice of law. The overwhelmingly persuasive reasons (to us) for the adoption of this policy in the enforcement of our own disciplinary rules are set forth in *Mitchell, supra,* and in the quotation above from the Report of the ABA Special Committee on the Evaluation of Disciplinary Enforcement.

The fears set forth in the Report of the ABA Committee are not ephemeral. They are real. A recent bit of New Jersey legal history will suffice as an illustration. A New Jersey attorney, Milton Yormark, was convicted in the Essex County Court of

dent fails to appear or, if he appears and does not contest, the court shall take such action as justice may require. If the respondent appears and contests, the chief judge shall prescribe procedures to formulate the issues and to provide for a hearing in a manner similar to that set forth in Paragraph 4 hereof.

Rules of the United States District Court for the District of New Jersey, Rule 7 (hereinafter referred to as "Local Rule").

10. [A] majority of the Conference agreed that following a plea of guilty or a conviction in the court there would be an automatic suspension until further order of the court pending the outcome of State disciplinary proceedings. It was further agreed that at the time of the acceptance of a plea the defendant is to be informed that suspension would follow from the date of the sentence.

11. Three recent temporary suspensions by the New Jersey Supreme Court may be signaling a shift in this approach. In all three cases, the attorneys involved were convicted and temporarily suspended following conviction and before appellate review. However, the reported orders of suspension do not reveal whether the suspensions took place on the basis of the convictions alone, the convictions in conjunction with other evidence, or were independent of the convictions. *In re DeFazio*, 78 N.J. 617 (1978) (order to show cause and temporary suspension issued), 78 N.J. 621 (1978) (order to show cause returned and temporary suspension continued pending final determination of ethics complaint); *In re Block*, 78 N.J. 625 (1979) (order to show cause and temporary suspension issued), 78 N.J. 637 (1979) (order to show cause returned and temporary suspension continued pending final determination of ethics complaints); *In re Huber*, 79 N.J. 606 (1979) (order to show cause and temporary suspension issued on March 27, 1979), 79 N.J. 608 (1979) (order to show cause returned on April 10, 1979, and temporary suspension continued pending final determination of ethics complaint). DeFazio was convicted in this court and his appeal is now pending. Block was convicted in the United States District Court for the Eastern District of Pennsylvania and his conviction was affirmed on July 17, 1980. *United States v. Block*, 624 F.2d 1091 (3d Cir. 1980). Huber's conviction was affirmed on July 20, 1979. *United States v. Huber*, 603 F.2d 387 (2nd Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

conspiracy to obtain money by false pretenses and three substantive counts charging the obtaining of money by false pretenses. He was given a custodial term. *State v. Yormark*, 117 N.J.Super. 315, 284 A.2d 549 (App.Div.1971), *cert. denied*, 60 N.J. 138, 286 A.2d 511, *cert. denied sub nom. Mulvaney v. New Jersey*, 407 U.S. 925, 92 S.Ct. 2459, 32 L.Ed.2d 812 (1972). Yormark was disbarred on February 7, 1972, *In re Yormark*, 60 N.J. 175, 286 A.2d 511 (1972), following denial of his petition for certification to the New Jersey Supreme Court and before the denial of certiorari. He was, however, permitted to practice following his conviction until exhaustion of the New Jersey appellate process.[12] Yormark never served his sentence. He disappeared with a large amount of clients' funds. For an example of what Yormark's embezzlements led to, see *Tormo v. Yormark*, 398 F.Supp. 1159 (D.N.J.1975).

For the reasons set forth in this part of this opinion, this court is firm in its resolve to suspend any member of its bar convicted in this court on the basis of that conviction without waiting for the appellate process to run its course.

### III

The argument is made that the suspensions of these defendants were accomplished in violation of the procedural and substantive requirements of Local Rule 7.

■ Local Rule 7(2)(c) authorizes the suspension of a member of the bar "[w]ho has been convicted of a crime involving moral turpitude . . ." Nothing in our rules requires that such a conviction, in order to serve as a basis for suspension, be finalized by appeal. Local Rule 7(2)(c), on its face, provides ample authority for the suspensions under scrutiny here, providing only that the convictions underlying the suspension be for a crime or crimes involving moral turpitude, a subject that will be addressed below.[13]

It is true that Local Rule 7(3) of this court provides that proceedings that may lead to suspension "may be initiated" by an order to show cause. The Local Rule also provides that the Chief Judge may temporarily suspend "pending the termination of the proceedings" initiated by the order to show cause.

■ In retrospect, it would have been preferable to issue an order to show cause after conviction returnable on the day of sentence. As will be shown below, in light of the suspension policy we have adopted, the only legitimately arguable issue on the return day would have been whether the convictions, or some of them, were for crimes involving moral turpitude. In light of the nature of the crimes involved here, it is inconceivable that suspension would not have ensued as it did. No prejudice has inured to the defendants because of any procedural default leading to the suspensions. Furthermore, on this motion the issue of moral turpitude has been briefed and argued. With respect to it, the defendants have been fully heard. It is to that issue I now turn.

**12.** Yormark had an extensive plaintiff's personal injury practice. During the early 1970s, I was a judge of the Essex County Court. Yormark was regularly before me and many other judges including those of this court while under indictment and following conviction, trying and settling cases on behalf of his clients.

Since the time of the Yormark proceedings the New Jersey Supreme Court has promulgated an extensive revision of that state's attorney disciplinary procedures, N.J.R. 1:20 *et seq.*, and provision is made for prompt suspension of an attorney where necessary to protect the interests of an attorney, a client or the public. N.J.R. 1:20–3(i). It is not necessary that an attorney be convicted of a crime or even charged with a crime to bring this provision into play. In addition, where circumstances warrant it, the Trustees of the New Jersey Clients' Security Fund may now apply for the appointment of a custodial receiver to take possession of the property of an attorney. N.J.R. 1:28–8.

**13.** There is no need to determine in this case whether our suspension policy, as reflected in the minutes of the April 23, 1975 meeting, *see* n. 10 *supra*, extends to convictions for crimes not falling within the ambit of the moral turpitude standard, for the reason that the crimes involved here fit squarely within it.

## IV

■ Before discussing application of the moral turpitude standard to the crimes of which the defendants were convicted, it would be appropriate to outline the nature and elements of those crimes as they were charged to the jury. I do not intend to repeat the jury charge at length, but will summarize it sufficiently to show the elements that the jury necessarily had to find in order to convict.

With respect to the counts (II and III) which charged violations of 18 U.S.C. § 1954, the jury was given alternate theories. Before these are outlined, it should be said that there never was any evidence that the defendants exercised any influence with respect to the granting of the loans to enterprises controlled by Marlin. Also, there was no evidence that the duties of defendants, as counsel to the Pension Fund, ever involved them in the loan making process with respect to the advisability of the loan, the selection of borrowers, the drafting of legal documents with respect to a loan or in any other way.

One theory of violation of section 1954, as charged, was that the defendants received or agreed to receive the "kickbacks" with the stated purpose of influencing the granting of the loans. The alternate theory was that they received or agreed to receive the "kickbacks" with the intent to influence the granting of the loans. It is obvious that a corrupt intent would have to underlie a conviction on either theory. They either stated a corrupt purpose in connection with accepting or agreeing to accept Marlin's cash to influence the loans, or they corruptly agreed to accept or did accept his money with an intent to influence the loans.

On Count V, charging attempted obstruction of justice in violation of 18 U.S.C. § 1503, in order to convict, the jury had to find that: (1) the defendants knew or reasonably believed that Kate Edelman would be a witness in a then current grand jury investigation; and, (2) they "knowingly,

willfully and corruptly endeavored to induce Kate Edelman to render false and misleading testimony to the ... Grand Jury." There can be little argument with the proposition that for an attorney to attempt to induce a witness to testify falsely under oath in a judicial proceeding is an action involving moral turpitude.

The tax counts were brought under 26 U.S.C. § 7206(1). The jury was given the following elements of these crimes:

1. That each defendant made and subscribed the individual returns in question;

2. That the return contained a written declaration that it was made under the penalties of perjury;

3. That the defendants did not believe the returns to be true and correct as to every material matter; and

4. That the defendants acted knowingly and willfully.

The issues with respect to the 1975 returns were specifically limited to the "kickback" income the government contended the defendants received during that year, and, as to the 1976 returns, the issues were limited to the receipt of interest income on the foreign bank accounts as detailed above.

In order to convict on the tax counts, the jury had to find that the defendants received both the "kickback" and interest income alleged, knew they had received it, knowingly failed to report it and "specifically intended the return to be false."[14]

That the crimes involved here are crimes of moral turpitude is, I think, obvious, and needs little discussion. Whatever arguments there might be on the periphery of that concept, what these defendants did is squarely within it.

A leading definitional discussion of moral turpitude is contained in *Jordan v. DeGeorge,* 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951). The holding of that case is that conspiracy to defraud the United States of taxes on distilled spirits is a crime involving

---

**14.** I have not discussed the conspiracy and Travel Act charges above because they are subsumed within the section 1954 violations.

moral turpitude. That result is concrete authority for the proposition that the section 7206(1) violations in this case are also crimes involving moral turpitude, for a purpose in knowingly omitting to report income has to be to avoid taxation, thus defrauding the United States of income taxes justly due it. The numerical weight of authority so holds. Annotation, *Federal Income Tax Conviction as Involving Moral Turpitude Warranting Disciplinary Action Against Attorney*, 63 A.L.R.3d 476, 500 (1975).

In *Jordan v. DeGeorge*, the Court stated: "Without exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude." 341 U.S. at 227, 71 S.Ct. at 705, 95 L.Ed. 886.

The conduct that led to these convictions is permeated with fraud, and this is as true of the section 1954 convictions as it is the others, wherein a grand jury was attempted to be defrauded by the presentation of perjurious testimony and the United States was defrauded of taxes. With respect to the section 1954 counts, defendants either accepted or agreed to accept the "kickbacks" upon the representation that they could and would influence the loans, or did so with an intent to exercise such influence. They, thus, either promised, in exchange for what amounts to a bribe, to exercise influence as to the loans, or agreed to accept money with an intent to do so. In either case, they used their position as counsel to the Fund as leverage to obtain money not rightfully theirs.

H. Drinker, *Legal Ethics* (1953) at 43, discusses conviction of a crime involving moral turpitude as a basis for disbarment. He points out that the ultimate question is the fitness of the lawyer to continue to engage in the practice of law. To ask whether these defendants, in light of their conduct that led to the convictions upon which their suspensions are based, remain fit persons to conduct the legal business of others, is to answer it. Obviously, they are not.

For the reasons set forth in this opinion, the motion of defendants to vacate the orders of suspension entered June 6, 1980, is denied.

This opinion has been circulated among all the judges sitting in this district and I am authorized to say that all concur in it.[15]

An order denying the motion by defendants to vacate their suspensions has been signed by Chief Judge Fisher and has been filed.[16]

---

15. This case was considered in depth at a conference of the judges of this district on December 2, 1980. Absent were only Senior Judges Coolahan and Cohen.

16. The court wishes to express its thanks to Donald A. Robinson, Esq., who, acting under appointment by Chief Judge Fisher, submitted a brief and argued in opposition to the motion.