**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Melvin R. JENNINGS, Defendant-Appellant.**

No. 83–4426.

United States Court of Appeals, Fifth Circuit.

Jan. 23, 1984.

Rehearing Denied Feb. 29, 1984.

Walls, Buck & Irving Ltd., Robert E. Buck, Greenville, Miss., for defendant-appellant.

James B. Tucker, Asst. U.S. Atty., Jackson, Miss., for plaintiff-appellee.

Before GEE and GARWOOD, Circuit Judges, and EAST *, District Judge.

GARWOOD, Circuit Judge:

This is an appeal from a judgment of conviction under 18 U.S.C. § 287[1] for making false claims to an agency of the United States government. The claims involved were those on behalf of an organization known as South People, Inc. (SPI) presented to the United States Department of Agriculture (USDA), through the Mississippi State Department of Education (SDOE), for reimbursement for meals served to children under the Child Care Food Program, see 42 U.S.C. § 1776. Appellant Melvin R. Jennings was charged in a twelve-count indictment with making, presenting, and causing to be made and presented these allegedly false claims for each of the twelve months beginning in October 1979 and continuing through September 1980. At trial, the jury found Jennings guilty on four of the twelve counts and acquitted him on the other eight.[2]

On appeal, Jennings raises a number of evidentiary and procedural issues. Because we find no prejudicial error in the conduct of the trial below, Jennings' conviction is affirmed. Jennings also argues that the trial court erred in summarily suspending him from practicing law in the federal courts of the Southern District of Mississippi. We decline to disturb the order of suspension.

I.

Jennings, a licensed attorney in the State of Mississippi, served as general counsel for SPI, a nonprofit corporation in whose formation Jennings played the principal part. In August 1979, SPI entered into an agreement with SDOE whereby SDOE agreed to reimburse SPI for certain meal expenses incurred by the day care centers under SPI sponsorship.[3] Under the sponsorship arrangement, each of the centers sponsored provided SPI with the information necessary to submit the monthly claim for reimbursement to SDOE. This information was brought to Jennings' law office by the various centers. Jennings' office personnel would then total the figures from the individual centers into a blanket claim for reimbursement which was submitted by SPI to SDOE. SDOE would process the claim and forward a monthly check payable to SPI which Jennings would deposit in his escrow

---

* District Judge of the District of Oregon, sitting by designation.

1. Section 287 provides:
    "Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. The jury found Jennings guilty of counts two, four, eight, and twelve. These counts involved the months of November 1979, January 1980, May 1980, and September 1980, respectively.

3. During the period from October 1979 through September 1980, SPI sponsored a total of eight child care centers. In order to participate in the Child Care Food Program, each of the centers had to be licensed by the Mississippi State Board of Health (MSBH), and the MSBH determined how many children could be enrolled by each center. The number established by the MSBH also operated as a ceiling for the number of children for whom reimbursement could be sought under the Child Care Food Program. The centers sponsored by SPI and their respective maximum enrollment numbers assigned by MSBH were: Anderson Day Care Center (17), Bryant's Nursery (15), Clairmont Preschool Learning Center (27), Jones Day Care Center (15), Millers Day Care Center (24), Tottsville Child Care Center (64), Keyboard Kiddie Care (15), and Northside Drive Childhood Center (34).

account.[4] SPI charged each of the day care centers ten percent of the reimbursement funds for administrative costs. When the check from SDOE arrived, Jennings or his staff would determine what each of the centers was entitled to receive for that particular month, deduct ten percent, and forward the remainder to the centers.

The false claim alleged in each count of the indictment pertained to that part of the claim for reimbursement involving the Tottsville Child Care Center which was owned and operated by Jennings. The principal witnesses against Jennings at trial were three women who served as his legal secretaries during the period of time from October 1979 through September 1980. The first of these was Evelyn Henry, who began working for Jennings in September 1975. She testified that at some point prior to October 1979, Jennings told her that she had been elected president of SPI, and she subsequently signed the October 1979 SPI claim for reimbursement from SDOE. Henry stopped working for Jennings, however, in the latter part of the same month, but at that time Jennings requested and received from her a power of attorney authorizing him or his representative to sign her name to SPI documents.

According to the government's evidence, Jennings instructed the secretaries who followed Henry to sign Henry's name to the monthly claims for reimbursement submitted to SDOE. He explained to them how to compile the information from the individual day care centers to complete the master claim. One of these secretaries, Jackie Hart, testified that while the figures for the other centers needed to complete the master claim came from those centers, the figures for Tottsville came directly from Jennings. According to Hart, regarding the preparation of the work sheets reflecting the meal count from Tottsville, either Jennings would prepare the work sheets himself, taking the figures "from the top of his head," or he would show Hart how to complete the work sheets. Jennings told her that the meal count had to be within a certain range, that she should never be consistent in completing the work sheets, and that she should not use the same number of meals too often. Jennings also told Hart to represent herself as Henry if asked who she was when submitting a claim to SDOE.

The government's evidence showed that Jennings had instructed Helen Knight, the director of the Tottsville center from 1978 to 1981, to inflate the number of meals purportedly served at the center when she filled out the work sheets from which Tottsville's claim for reimbursement was completed. Jennings explained to her that "he didn't have any money coming in and the only way we were going to be working is we had to inflate the numbers so we'd have some money." The director testified that during the school year from September 1979 through May 1980 the average attendance was approximately thirty-five students; during the summer the average dropped to twenty-five. The claims for reimbursement for the Tottsville center for this period, however, consistently represented that more students had been in attendance. The government's evidence further demonstrated that the disparity between the number of children actually attending Tottsville and the number represented by the claims for reimbursement was not unknown to Jennings since he had stopped by the center almost every day and had seen the number of children in attendance.

4. Pursuant to the Child Care Food Program, the SDOE served as a conduit for funds made available by the federal government to Child Care Food Program sponsors. Thus, while the claims for reimbursement were submitted by SPI to SDOE, they were actually claims made upon the United States and therefore subject to the provisions of 18 U.S.C. § 287. This fact was made known to sponsors by a notice at the bottom of the claim for reimbursement form which stated, "I understand that the information on this Claim for Reimbursement and Claim for Reimbursement Worksheet is being given in connection with the receipt of Federal funds and that deliberate misrepresentation may subject me to prosecution under applicable State and Federal Criminal Statutes." This aspect of the matter is not in dispute on appeal, nor was it at trial.

The government also introduced the testimony of the SDOE area supervisor for the Child Care Food Program who had on two occasions visited the Tottsville center and observed the number of children eating a particular meal. The supervisor's report concerning a visit made on November 16, 1979 indicated that forty children had eaten breakfast at the center. The November 1979 work sheet for Tottsville showed that reimbursement for sixty-four breakfasts had been sought for the same date. The supervisor's report on an April 4, 1980 visit indicated that thirty-two children had been served an afternoon snack. The April work sheet sought reimbursement for sixty-four children on that date.

From October 1980 through February 1981, Pace and Shelton, an independent firm, conducted an audit for SPI's activities regarding the Child Care Food Program. Jennings complained to SDOE about the results obtained by Pace and Shelton, and subsequently the matter was transferred to USDA for resolution. Auditor McDonald of USDA was assigned to conduct another audit of SPI. After reviewing SPI's records and discovering possible program violations, McDonald referred the matter to the investigations section of USDA's Office of Inspector General. In the course of McDonald's audit, he had copied some of the SPI documents and eventually turned these copies over to the Investigations division, although none of the copies were introduced at trial. Investigator Brewer, who testified for the government at trial,[5] proceeded to visit Jennings' office where he identified himself as being a part of an investigation separate from auditor McDonald and the Pace and Shelton audit. He did not, however, disclose to Jennings that he was conducting a criminal investigation. Jennings subsequently provided Brewer with the records pertaining to the period from October 1979 through September 1980. As a result of Brewer's investigation, the instant indictment was ultimately returned.

**5.** Brewer testified at the beginning of the government's case and again at the end as a summary witness.

## II.

Jennings' first claim of error concerns the government's use of certain summary charts at trial. Twelve of these charts consisted of summaries of the meals claimed to have been served by the day care centers under SPI sponsorship for each of the months beginning with October 1979 through September 1980. Government exhibit 49A (against which, together with government exhibit 51A, Jennings' major complaints are directed) presented a comparison of what the government asserted was the actual number of meals served at the Tottsville center during twenty-two days[6] with the meals claimed for reimbursement for those same days. Government exhibit 51A consisted of a presentation, based on an extrapolation of the average number of meals served at Tottsville during the twenty-two days summarized in exhibit 49A, of the amount of reimbursement Tottsville was actually entitled to for the twelve months in question.

Federal Rule of Evidence 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation." Recognizing the possibility for misuse of summary charts, this Court has previously cautioned that a trial judge must carefully handle their preparation and use. *Myers v. United States,* 356 F.2d 469, 470 (5th Cir.), *cert. denied,* 384 U.S. 952, 86 S.Ct. 1572, 16 L.Ed.2d 548 (1966). We here reiterate that caution. Jennings argues initially that the documents involved in this case were not so voluminous as to allow the use of summary charts. Nevertheless, insofar as the documents underlying these summary charts include almost two hundred pages of material and substantial amounts of mathematical calculations, we cannot find that the trial court abused its discretion in allowing their

**6.** Twenty and two-thirds days in September 1980 and one meal each on November 19, 1979 and on April 4, 1980.

use for the convenience of the jury. These documents included claims for reimbursement, work sheets used to compile the figures used in the claims, and itemized menus. "The most commonly recognized application of this principle is that by which the state of *pecuniary accounts* or other business transactions is allowed to be shown by a witness' schedule or summary." 4 Wigmore, *Evidence* § 1230 at 537 (Chadbourn rev. 1972) (footnote omitted) (emphasis in original).

Neither do we find that the charts were not supported by evidence. The government's summary witness explained in some detail how he had derived figures contained in the summary charts from the underlying documents. Although certain of the conclusions in the summary charts are undoubtedly the product of assumptions made by the government, these assumptions are not *per se* impermissible. This Court has recently noted that such assumptions are allowed "so long as supporting evidence has been presented previously to the jury . . . and where the court has 'made it clear that the ultimate decision should be made by the jury as to what weight should be given to the evidence.'" *United States v. Means,* 695 F.2d 811, 817 (5th Cir.1983) (citing *United States v. Diez,* 515 F.2d 892, 905 (5th Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976), and quoting *United States v. Andrew,* 606 F.2d 549, 550 (5th Cir.1979)). The central assumption attacked by Jennings in this case is the government's use of the average number of actual meals served from government exhibit 49A (based on an analysis of twenty-two days) to derive, by extrapolation, the total reimbursement that Tottsville was entitled to for the months of October 1979 through September 1980. Government exhibit 51A, therefore, essentially assumes that the pattern of average actual numbers served per meal demonstrated for the twenty-two days analyzed in exhibit 49A was not exceeded on a monthly basis throughout the balance of the year. This assumption was supported by the testimony of day care

center workers that the average attendance during the months involved was consistently less than that reflected by the claims for reimbursement, and by the evidence that actual attendance was higher in the September to May period than in June, July, and August. The assumption was also fully exposed as such during cross-examination of the government's summary witness. Furthermore, the trial court repeatedly admonished the jury that the summary charts were the government's view of the evidence and that it was the jury's responsibility to determine whether the matters contained in the charts were, in fact, true and correct. We note also that the witness preparing the chart "was subject to full cross-examination by defendant['s] attorneys" concerning the matters reflected by exhibit 51A and the assumptions on which it was based. *Means* at 817. The trial court has discretion in these matters, *Means* at 817, and although it is arguable that the nexus between exhibit 51A's conclusions and the supporting evidence is close to being as attenuated as should be allowed for such form of presentation and that hence the trial court's ruling approached the limits of its discretion, we cannot say that those limits were exceeded or the discretion abused.

Even if it were determined that the trial court abused its discretion in allowing the use of the government's summary charts, we cannot see that Jennings was prejudiced thereby. The full cross-examination and the trial court's admonitions to the jury served to minimize the risk of prejudice. Moreover, that the jury returned a verdict of guilty on only four counts demonstrates that it did not blanketly or indiscriminately accept the results of the government's summary charts. Jennings' main complaint of the charts is their assumption that all the months were similar in number of meals actually served. The jury rejected that assumption. It found Jennings guilty on only four of the twelve counts, and the convictions on those counts were amply supported by evidence independent of the conclusions reached by the summary charts.[7]

7. We consider some of the evidence supporting     the jury's verdict of guilty on the four counts in

Jennings also argues that the government's summary witness was not qualified to testify concerning the summary charts. He contends that the preparation of summary charts such as those used in this case and the presentation of those charts in court must be done by an expert witness qualified to give opinions in the area in which he is called upon to testify, or by a witness who has specialized knowledge about the subject matter about which he testifies. He cites *United States v. Seelig,* 622 F.2d 207, 215 (6th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980), for this proposition. In *Seelig,* however, the court found that a summary chart could not be used because the underlying records on which the chart was based were not introduced as exhibits nor were they made available to the opponents as required by Fed.R.Evid. 1006. The court then considered whether the charts could be introduced under the exception for the basis of opinion testimony by experts, pursuant to Fed.R.Evid. 703. The court concluded that the summary witness was not an expert and therefore Rule 703 did not apply.

■ The position actually adopted by the Sixth Circuit and the one that this Court follows is that when a chart does not contain complicated calculations requiring the need of an expert for accuracy, no special expertise is required in presenting the chart. *See United States v. Scales,* 594 F.2d 558, 563 (6th Cir.), *cert. denied,* 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979). The calculations in this case were

of such a nature, and the government's witness, who, though not an accountant, had received training in accounting procedures and in claim investigations of this kind, was qualified to testify concerning the summary charts.[8]

### III.

■ Jennings complains of certain comments made by the prosecutor during his closing argument, alleging that these comments were an attack upon counsel for the defense and therefore prejudicial error.[9] The prosecutor's remarks may reasonably be construed as an attempt to explain why certain of the government's witnesses were uncooperative with Jennings' attorneys prior to trial. Counsel for the defense had repeatedly claimed in their cross-examination of these witnesses that they had denied Jennings his constitutional rights by refusing to talk with his attorneys prior to trial. The prosecutor also alluded to defense counsel's suggestions to various of these witnesses during cross-examination that they had engaged in prostitution, embezzlement, and "intimate relationships" with a government investigator and a third party. In light of these attacks upon the credibility of the government witnesses, the prosecutor was "not obliged to sit quietly while character assaults [were] made on his witnesses; he [was] entitled to argue fairly their credibility." *United States v. Bright,* 630 F.2d 804, 824 (5th Cir.1980). Moreover, even if the prosecutor's remarks are con-

---

our discussion of Jennings' objection to the use of the modified *Allen* charge in the trial below. Other evidence is reflected in part I of this opinion. The sufficiency of the evidence is not challenged as to any of the counts of which Jennings was convicted.

**8.** The trial court found that the government's summary witness had specialized knowledge insofar as he was "an investigator in this field for the United States Department of Agriculture who is familiar with the forms, their preparation, and the regulations regarding them." The witness testified that he had received training in accounting principles, tracing of funds and document examination through the Federal Law Enforcement Training Center located in Glencoe, Georgia.

**9.** The relevant remarks of the prosecutor are as follows:

"Let me talk about one thing before we leave, before my time runs out. You think about those ladies from there. Now they want to talk about those ladies not talking to them prior to the time they came to the courtroom. Did you—you did, you observed the way they treated those ladies here in this courtroom. I mean the gall that they had to ask them the questions they did and treat them the way they did right here in front of y'all, can you imagine—can you imagine what these gentlemen would have done if those ladies had dared talk to them out on the street?"

strued as an attack upon defendant's counsel, we do not find that the error was sufficiently prejudicial to warrant reversal.

## IV.

In preparation for the trial below, Jennings' counsel moved pursuant to Fed.R. Crim.P. 16 for discovery of the criminal records, if any, of the government's prospective witnesses. The motion was granted. During the course of cross-examination of one of the government's witnesses at trial, Jackie Hart, that witness testified that she had been convicted of attempting to cash a check that she had taken from Jennings' office. The government had not produced the criminal record of this witness,[10] and Jennings therefore moved that the witness' testimony be stricken and the jury instructed to disregard the testimony of the witness for failure to comply with the court's order. The trial court denied the motion.

We note that "[r]elief for violations of discovery rules is in the discretion of the trial court. To support a claim for reversal of the exercise of that discretion, the accused must show prejudice to substantial rights." *United States v. Valdes,* 545 F.2d 957, 961 (5th Cir.1977). *See also United States v. Arcentales,* 532 F.2d 1046 (5th Cir.1976); *United States v. Saitta,* 443 F.2d 830 (5th Cir.), *cert. denied,* 404 U.S. 938, 92 S.Ct. 269, 30 L.Ed.2d 250 (1971). There was no showing of prejudice in the present case. Counsel for defense admitted that they were aware of the witness' arrest for attempting to cash the check; Jennings was the complaining witness in that case. Moreover, as the trial court observed, "it was obvious from defense counsel's questioning of the witness that they had known about this conviction and the details of it."[11] Even if Jennings had not known of

---

**10.** The prosecutor stated to the trial court that he had questioned all the witnesses as to whether they had ever been convicted and that all the witnesses represented to him that they had not. The night before Hart testified the prosecutor questioned her on the basis of testimony that had come out at trial to the effect that she had been arrested for trying to cash checks from Jennings' office. He stated that Hart told him that she had been arrested and that "the matter had been disposed of thereafter." He maintained that he had no reason to believe that she had been convicted.

**11.** "[MR. WALLS (Counsel for Defendant)]: Q. Now you testified a few minutes ago about being arrested. Isn't it a fact that this occurred when you left from Mr. Jennings' office one day for lunch?

"[Mrs. Hart (Witness)]: A. Yes, true.

"[MR. WALLS]: Q. And isn't it a fact that you had been working with the—

"BY MR. DAVIS [Prosecutor]: Your Honor, I object. He cannot go into the details upon impeachment.

"BY MR. WALLS: Your Honor, I'm talking about why she left work. She's testifying about a man she worked for.

"BY MR. DAVIS: She's testified about the arrest, your Honor. The Federal Rules do not provide for going into the details.

"BY MR. WALLS: Your Honor, they opened this area up.

"BY THE COURT: I'll let him proceed with this line of questioning.

"BY MR. WALLS, Continuing: Q. Mrs. Hart, isn't it a fact that this occurred regarding some checks for Jones Day Care Center?

"A. You mean the arrest?

"Q. Yes.

"A. Yes.

"Q. That you had taken as a result of your employment in Mr. Jennings' office?

"A. Yes.

"Q. That you went to the bank and attempted to cash those checks?

"A. One, yes.

"Q. Acting as if you were some person from Jones Day Care Center?

"A. Yes.

"Q. And that you never returned to Mr. Jennings' office after that?

"A. Correct.

". . . .

"BY MR. WALLS, Continuing: Q. Who accompanied you?

"A. To the bank?

"Q. Yes.

"A. A friend of mine.

"Q. Was it a man?

"A. Yes.

"Q. Was it your husband?

"A. No.

"Q. What was his name?

"A. L.V. Lowe.

"Q. Isn't he your boyfriend?

"A. No.

"Q. Now, Mrs. Hart, were you ever prosecuted for that?

"A. Yes.

"Q. Were you convicted of it?

"A. Yes.

"Q. Where were you convicted of that?

"A. Here in Hinds County.

the conviction, it is apparent that he got all the mileage out of it that he could have if informed of it earlier. If he were prejudiced by surprise he should have called it to the trial court's attention, and his remedy in that event would normally be to request a recess. *United States v. Bockius,* 564 F.2d 1193, 1196–97 (5th Cir.1977). No recess was requested here, obviously because none was needed. Under these circumstances, the trial court clearly did not abuse its discretion in refusing to strike the testimony of the witness.

## V.

Prior to the trial below Jennings filed a "Motion to Quash Indictment Based Upon Outrageous Governmental Conduct and Vindictive and Selective Prosecution of Defendant." This motion alleged broadly that blacks had been selectively prosecuted in the state of Mississippi and that government agents had, "disguising themselves as auditors, illegally, outrageously, and discriminatorily invaded his privacy and unlawfully searched and seized his property." The trial court denied this motion without a hearing but allowed Jennings to file sworn affidavits stating proffered facts. During the course of the trial Jennings subsequently filed an affidavit in support of the motion along with the deposition of an alleged witness, which exhibit was reviewed by the trial court.

■ In order to prevail in a defense of selective prosecution, a defendant must meet two requirements which we have characterized as a "heavy burden." *United*

States v. Johnson, 577 F.2d 1304, 1308 (5th Cir.1978) (quoting *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974)). First, he must make a *prima facie* showing that he has been singled out for prosecution although others similarly situated who have committed the same acts have not been prosecuted. *United States v. Tibbetts,* 646 F.2d 193, 195 (5th Cir.1981). Second, having made the first showing, he must then demonstrate that the government's selective prosecution of him has been constitutionally invidious. *Id.*[12] The showing of invidiousness is made if a defendant demonstrates that the government's selective prosecution is actuated by constitutionally impermissible motives on its part, such as racial or religious discrimination. *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980).

■ A defendant is not automatically entitled, however, to an evidentiary hearing to make the required showing. He must first present facts "sufficient to create a reasonable doubt about the constitutionality of a prosecution ...." *United States v. Hayes,* 589 F.2d 811, 819 (5th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979); *United States v. Ream,* 491 F.2d 1243, 1246 (5th Cir.1974). It is clear in the present case that Jennings did not offer such facts to the trial court. His motion to quash contained nothing more than broad allegations concerning the selective prosecution of blacks. Moreover, after reviewing the affidavit submitted by Jennings in support of the motion to quash and the statement of W.C. Battle, also offered

"Q. Here in Hinds County?
"A. Yes."

**12.** We have previously emphasized that selective prosecution, absent some invidious element, may not be challenged.

"As a substantive matter, the constitutional authority to 'take care that the laws [are] faithfully executed' is textually committed to the authority of the executive branch, U.S. Const. art. II, § 3; *United States v. Hamm,* 659 F.2d 624, 628 (5th Cir.1981) (en banc), and the authority of the executive branch to enforce the law in a selective fashion is legally unchallengable absent proof by the defendant that the government has exercised its

discretion upon an invidious basis such as race. *United States v. Batchelder,* 442 U.S. 114, 123–25 & n. 9, 99 S.Ct. 2198, 2204 & n. 9, 60 L.Ed.2d 755 (1979); *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604 (1978); *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962)." *United States v. Chagra,* 669 F.2d 241, 247 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982). *See also United States v. Johnson,* 577 F.2d 1304, 1307–09 (5th Cir.1978); *United States v. Ream,* 491 F.2d 1243, 1246 & n. 2 (5th Cir. 1974).

in support of the motion, we are unable to conclude that Jennings has presented facts sufficient to create a reasonable doubt about the selectivity of the prosecution in this case. That persons cooperating with the government in this case, and lower in the organizational structure than Jennings, were not prosecuted while Jennings was, does not come even close to meeting the "similarly situated" branch of the selective prosecution defense. Even assuming that Jennings had made the requisite showing that his prosecution was selective, he has offered nothing but bare general allegations that the selectivity was motivated by racial considerations.

Nor do we find that the trial court should have conducted a hearing on the basis of Jennings' allegations that the government had engaged in outrageous and vindictive conduct in prosecuting him. We can discern no reason for characterizing the government's conduct as vindictive. As to Jennings' charge that the government's conduct was outrageous, he appears to focus on the circumstances under which the government obtained certain documents from him relating to SPI's involvement in the Child Care Food Program. Jennings alleged, both in his motion to quash the indictment and in his motion to suppress certain illegally obtained evidence, that government agents had acquired documents from him under the guise of an audit or civil investigation when Jennings was actually the subject of a criminal investigation. Insofar as the trial judge did hear evidence on the motion to suppress concerning this allegation, Jennings was not prejudiced when the trial court declined to conduct another hearing concerning the government's allegedly outrageous conduct that would have simply repeated the same evidence heard on the motion to suppress. We therefore conclude that the trial court committed no error in refusing to grant Jennings a hearing on the motion to quash.

## VI.

Jennings further alleges as error the trial court's refusal to give the jury an instruc-tion on the failure of the government to call certain witnesses. Defendant's objections center on one potential witness in particular, namely, the USDA auditor who was assigned to audit SPI after Jennings had expressed disapproval of an audit performed by an independent audit firm.

A missing witness instruction is not justified if it appears that the testimony of the witness who is not called would likely have been merely cumulative or corroborative. *Georgia Southern and Florida Railway Co. v. Perry,* 326 F.2d 921, 924 (5th Cir.1964). *See also United States v. Ramzy,* 446 F.2d 1184, 1187 (5th Cir.), *cert. denied,* 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 544 (1971); *United States v. Tant,* 412 F.2d 840 (5th Cir.), *cert. denied,* 396 U.S. 876, 90 S.Ct. 152, 24 L.Ed.2d 134 (1969). The USDA auditor testified at a pretrial hearing, and it is clear from a review of the transcript of that hearing that his testimony was cumulative of the testimony given at trial by the government's summary witness. There was no showing to the contrary.

From the circumstances of this case it is clear that the government could have conceivably called either the USDA auditor or the investigative agent Brewer to testify concerning the numerous documents involved in this case. McDonald had originally audited SPI and was, therefore, presumably in a position to testify for the government concerning his findings. McDonald, however, upon discovering possible violations in the course of his audit, referred the matter to the USDA's investigative division, whereupon agent Brewer proceeded to conduct his own investigation into the records of SPI. Under the circumstances, the government's decision to call Brewer and not McDonald was a decision that spared the jury from needless cumulative testimony. To require the government to call McDonald in order to ward off a possible negative inference or to present testimony to explain why he was not called would have simply invited a waste of time.[13] Jennings

---

**13.** This is among the reasons why one com-mentator has noted that "[d]espite the pleni-

was, therefore, not entitled to the requested instruction.

## VII.

■ Jennings argues that the trial court erred in giving the modified *Allen* charge in this case. After the jury had deliberated for approximately one day, they returned a note to the trial judge indicating that they could not reach agreement on any of the twelve counts of the indictment. The trial judge then gave the jury the modified *Allen* charge. The jury retired for approximately two more hours of deliberations, after which they returned a verdict of guilty on four of the twelve counts. The thrust of Jennings' argument is that the *Allen* charge is particularly inappropriate in cases involving a multicount indictment, since the jury will almost certainly arrive at a compromise verdict. He specifically alleges that there was "no rhyme nor reason" for the jury's verdict in this case.

This Court has repeatedly upheld the use of the modified *Allen* charge. *See, e.g., United States v. Vincent,* 648 F.2d 1046, 1049 (5th Cir.1981); *United States v. Zicree,* 605 F.2d 1381, 1390 (5th Cir.1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). Moreover, the charge has been upheld in cases involving multicount indictments. *See, e.g., United States v. Blevinal,* 607 F.2d 1124 (5th Cir.1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980). We, therefore, find no misuse of the charge under the facts of this case.

Nor do we find that the jury's verdict was without rhyme or reason. The jury found Jennings guilty of counts two, four, eight, and twelve. Count two (November 1979) involved one of the months in which an SDOE official had made an on-site in-

spection of the Tottsville center that revealed a number of children in attendance that was substantially lower than the amount claimed in the claim for reimbursement for that center. Counts four (January 1980) and twelve (September 1980) were supported by work sheets filled out in Jennings' own handwriting. The actual meal count for September 1980 showed a much smaller number of meals than those claimed for. Finally, count eight (May 1980) was supported by the admission of Jennings' expert witness that Jennings had made a small overclaim for the month in question. We do not pass upon whether this evidence, standing alone, would support a conviction on each of the four counts, particularly count eight. But the referenced evidence by no means stands alone and we do find that it was sufficient to distinguish the jury's verdict of guilty on those counts from its acquittal on the other eight counts.

## VIII.

■ At trial below Jennings filed a motion to suppress the various records that had been obtained by the auditor, McDonald, and by the government investigator, Brewer. The motion was denied by the trial court and Jennings now contests that ruling. He alleges that these government agents seized the records under the guise of a civil audit when in actuality Jennings was under criminal investigation.

It is not necessary for this Court to determine whether, as Jennings suggests, government agents failed to inform him that he was under criminal investigation before obtaining records from him. The only records obtained were SPI's records relating to SPI's involvement in the Child Care Food Program, and the records so

tude of cases supporting the inference, caution in allowing it is suggested with increasing frequency." McCormick, *Evidence* § 272 at 657 (1972).

"This counsel of caution is reinforced by several factors. Possible conjecture or ambiguity of inference is often present. The possibility that the inference may be drawn invites waste of time in calling unnecessary witness-

es or in presenting evidence to explain why they were not called. Anticipating that the inference may be invoked entails substantial possibilities of surprise. And finally, the availability of modern discovery procedures serves to diminish both the justification and the need for the inference." *Id.* (footnotes omitted).

obtained were not introduced in evidence at trial. Paragraph 13 of the agreement entered into by SPI and SDOE (Government exhibit 2) required that SPI, "[u]pon request, make all accounts and records pertaining to the Program available, to State Agency and United States Department of Agriculture representatives, for audit or review at any reasonable time and place." The records in question were likewise those which the contract required SPI to keep and maintain. By entering into this agreement, SPI voluntarily waived any claims to privacy that it might have had with respect to documents relating to this contract. *Zap v. United States,* 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946). In *United States v. Griffin,* 555 F.2d 1323 (5th Cir. 1977), this Court considered a set of circumstances essentially identical to those presented by this case. There, the owner of a drugstore, apparently a sole proprietorship, had entered into an agreement with the Texas State Department of Welfare whereby he would be reimbursed by the state for providing pharmaceutical services to welfare recipients. He entered into a contract with the state agency that required him to permit state officials to examine the prescription records of welfare recipients. On the occasion in question, state agents arrived at the drugstore and requested permission to examine the records. The agents were asked to wait until the owner of the drugstore returned to the store, but after waiting a short while, they began to examine the records and also seized the store's copies of those prescriptions paid for by the state agency. This Court determined that the owner had "knowingly and voluntarily agreed by contract to maintain records of the prescriptions which he billed to the state and to make these records available for inspection at any time." *Id.* at 1325.

Defendant's reliance upon *United States v. Tweel,* 550 F.2d 297 (5th Cir.1977), is misplaced. In *Tweel,* this Court held that the failure of an IRS agent to apprise a defendant of the criminal nature of his investigation before obtaining permission from the defendant to copy certain of the defendant's own tax records constituted an unreasonable search and seizure. Since the consent was obtained by deception, there was a violation of the defendant's Fourth Amendment rights. In the present case, however, consent to examine SPI's records was not obtained by deception—but rather by contractual agreement. We also observe that the records in question were SPI's, not Jennings'.[14]

We hold that the motion to suppress was, therefore, properly denied.

## IX.

■ Jennings' final claim of error concerns the trial court's suspension of him from the practice of law in the federal courts of the Southern District of Mississippi.[15] He argues that he was denied due process of law when the order of suspension was entered before his conviction became

---

14. As noted, SPI was a Mississippi nonprofit corporation. Its referenced agreement with SDOE recites that SPI warrants and represents that it is a nonprofit agency which is either "exempt" (or in the process of becoming so) from federal "income tax under Section 501(c)(3) of the Internal Revenue Code of 1954" or is "currently operating a federally funded program requiring nonprofit tax exempt status" and that it accepts "final financial and administrative responsibility" for its part of the contract.

15. The trial judge entered the order of suspension on the basis of Rule 1 of the Rules of the United States District Court for the Southern District of Mississippi. The rule states in pertinent part:

"ADMISSION OF ATTORNEYS

"A. *General Admission.* Any attorney properly shown to the satisfaction of the Court then to be in good standing as a member of the Bar of the State of Mississippi and admitted to practice before the Mississippi Supreme Court shall be admitted to practice generally as a member of the Bar of this Court upon taking the oath, subscribing the Roll of Attorneys of this Court, and paying the fee to the Clerk therefore; and such attorney shall enjoy all the rights and privileges as an attorney of this Court during good behavior, *until otherwise ordered by the Court.*"

final on appeal,[16] and, moreover, that he was also denied due process by the failure of the trial court to conduct a hearing prior to entering the order of suspension.

Jennings relies on *In re Ming,* 469 F.2d 1352 (7th Cir.1972), for the proposition that if a conviction itself is to be used to form the basis for an attorney's suspension, then, "that conviction must have reached finality, at least to the extent of exhaustion of direct appeals." *Id.* at 1354. *Ming* involved conviction of the misdemeanor offense of willful failure to file income tax returns. The Third Circuit apparently has taken a different position, however. In *United States v. Friedland,* 502 F.Supp. 611 (D.N.J. 1980), *aff'd without opinion,* 672 F.2d 905 (3d Cir.1981), the district court held that "a court constitutionally may suspend a member of its bar summarily on the basis of a felony conviction even though that conviction has not been finalized by completion of the appellate process." *Id.* at 616. The *Friedland* opinion was approved by "all the judges sitting in this district." *Id.* at 620. The conviction there considered was for felonies involving moral turpitude. *Id.* at 619–20.

The question before us is a matter of first impression for this Court. The offenses here are plainly felonies involving moral turpitude. *See Jordan v. DeGeorge,* 341 U.S. 223, 227, 71 S.Ct. 703, 705, 95 L.Ed. 886 (1951).

Having considered the reasoning of the opinion in *Ming, supra,* we are not convinced that due process requires that conviction of a felony involving moral turpitude be final before it can be used as a basis for suspending an individual from the practice of law before a federal court. The thrust of the argument in *Ming* was that since the Seventh Circuit had construed 8 U.S.C. § 1251(a)(11), concerning the statutory basis for deportation of aliens, so that "conviction" was held to mean "final con-

viction," *see Will v. Immigration and Naturalization Service,* 447 F.2d 529, 531, 533 (7th Cir.1971), conviction should be construed similarly in the context of disbarment proceedings directed against a lawyer. The court observed that, "[i]n looking at the panoply of individual rights, we do not find a basis for awarding a citizen lawyer a lesser position than the alien." 469 F.2d at 1354.

We note to begin with our disagreement with *Ming's* apparent assumption that temporary suspension from the practice of law pending an appeal is as severe a sanction as deportation.

More importantly, in our view *Ming* does not take adequate note of the public interest in avoiding the appearance of impropriety in the legal profession. This interest distinguishes the lawyer from the alien. As the Seventh Circuit itself has stated, "the real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust." *In re Echeles,* 430 F.2d 347, 350 (7th Cir.1970). Once viewed from the standpoint of the need to uphold public confidence in the bar, the fact that a conviction has not yet been sustained on appeal loses much of its significance.

> "It is not the fact that the attorney may have committed the underlying wrong, but the fact that the attorney is a 'convicted felon' or stands convicted of an offense involving moral turpitude that tends to impair public confidence in the judicial system and the integrity of the bar as a whole." *In re Stoner,* 507 F.Supp. 490, 492 (N.D.Ga.1981).

The American Bar Association Special Committee on the Evaluation of Disciplinary Enforcement has, moreover, pointed out that allowing a lawyer to practice pending appeal of a criminal conviction not only

---

**16.** The government argues that Jennings' objections are moot, since if we affirm his conviction there is no appeal pending and if we reverse his conviction he will no longer be suspended. Nevertheless, Jennings has the option of filing a petition for a writ of certiorari in the United States Supreme Court. We, therefore, proceed on the assumption that our affirmance of his conviction does not moot the present point. *See In re Ming,* 469 F.2d 1352, 1354 (7th Cir.1972).

affects the public's appraisal of the legal profession, but also the interests of individual clients.

"No single facet of disciplinary enforcement is more to blame for any lack of public confidence in the integrity of the bar than the policy that permits a convicted attorney to continue to practice [pending appeal] while apparently enjoying immunity from discipline....

" ....

. "The consequences of permitting the convicted attorney to continue to practice are not limited to the adverse effect upon the reputation of the profession. The clients of the convicted attorney suffer also. One who is unaware of the conviction might retain the attorney and unwittingly compromise his rights. Adversary counsel aware of the conviction may be reluctant to negotiate with the attorney, to enter on a settlement with him, to entrust him with an escrow fund, or to be associated with him of counsel. These are all circumstances totally unrelated to the merits of the client's cause, and they may impair it. Moreover, the conviction may be affirmed and the attorney sent to prison while the new client's claim is pending. The client will then be forced to employ new counsel, who will have to familiarize himself with the matter. This means more delay and considerable duplication of expense to the client.

"There is a further threat to the convicted attorney's client. The attorney, aware that the conviction ultimately will result in his disbarment, and, assuming that he has little to lose, he may engage in serious misconduct toward his remaining clients for his own personal gain.

"A policy which thus jeopardizes the rights of innocent clients cannot be justified." *Report of the Special Committee*

*on Evaluation of Disciplinary Enforcement,* 95 A.B.A. Reports, 783, 920–21 (1970).

*See also* the Model Federal Rules of Disciplinary Enforcement, approved September 21, 1978, by the Judicial Conference of the United States and recommended for adoption on an optional basis by all federal trial and appellate courts, the relevant portions of which are set out in the *Friedland* opinion. 502 F.Supp. 611 at 615 n. 7.[17]

We agree with the statement of the New York Court of Appeals that "[t]o permit a convicted felon to continue to appear in our courts and to continue to give advice and counsel would not 'advance the ends of justice,' but instead would invite scorn and disrespect for our rule of law." *Mitchell v. Association of Bar of City of New York,* 40 N.Y.2d 153, 156, 386 N.Y.S.2d 95, 97, 351 N.E.2d 743, 745 (1976). *See also State Bar of Texas v. Heard,* 603 S.W.2d 829, 834 (Tex.1980) ("An attorney who is convicted of ... [an offense involving moral turpitude] cannot hold the confidence of the public or the profession as long as the conviction stands."). We also observe that attorneys are officers of the courts before which they practice, and the necessary mutual confidence between bench and bar is undermined when the attorney stands convicted of a felony involving moral turpitude. Accordingly, we hold that due process allows the use of a conviction of a felony involving moral turpitude as a basis for the suspension of Jennings from practice before the Southern District of Mississippi before that conviction has been finalized on appeal.[18]

■ Jennings also complains that he was denied due process of law when the order of suspension was entered by the trial court without conducting a hearing. We find this argument without merit, however,

---

**17.** Additionally relevant is the action of the Supreme Court in *In re Mitchell,* 420 U.S. 1001, 95 S.Ct. 1442, 43 L.Ed.2d 759 (1975), in suspending an attorney from practice there and issuing an order that he show cause why he should not be disbarred. As *Friedland* points out, 502 F.Supp. at 616 n. 9, the Supreme Court's suspension was apparently taken on the basis of New York disciplinary action

against the attorney at a time when appeal of that action was still pending before the New York Court of Appeals.

**18.** Of course, should this Court, or the Supreme Court, reverse Jennings' conviction, then his suspension will automatically terminate.

under the particular facts of this case. In the first place, the judge who entered the order of suspension had also presided over the trial at which Jennings was convicted. Under these circumstances it is inconceivable that a hearing would have resulted in other than an order of suspension. The situation in this case is thus parallel to that presented in *Friedland*, where the court determined that the only question that could have been addressed by a post-conviction hearing preceding the order of suspension was whether the crime of which the defendants had been convicted involved moral turpitude. Because the court found a hearing would have certainly concluded that the crime could be so characterized, it concluded that "[n]o prejudice has inured to the defendants because of any procedural default leading to the suspensions." 502 F.Supp. at 618. Here it is plain, as a matter of law, that offenses of which Jennings was convicted are ones involving moral turpitude, and Jennings has not claimed otherwise. We conclude that Jennings was not prejudiced by the failure of the trial judge to hold a separate hearing when he himself had presided at the trial.

In the second place, we cannot find that Jennings has been prejudiced by the lack of a hearing. When the prosecutor originally made recommendations concerning the sentence that Jennings should receive, he also recommended that Jennings be suspended from the practice of law before the federal courts of the Southern District of Mississippi. At that time, Jennings and his attorneys were given an opportunity to respond before the trial judge rendered his decision. Neither complained of the lack of hearing or made any comments at all regarding the suggested suspension. Furthermore, although Jennings' Motion for Stay of Order Suspending Defendant from Practicing Law filed below makes passing mention of the trial court's failure to conduct a hearing, it does not request a hearing, nor does it disclose what matters Jennings would have brought before the attention of the court had such a hearing been held. The primary argument of the motion is directed toward contending that the trial court

should not have suspended Jennings before his conviction was finalized by appeal. Under the particular circumstances we hold that Jennings was not denied due process of law.

The judgment of conviction and the order suspending Jennings from the practice of law before the federal courts in the Southern District of Mississippi is therefore affirmed.

AFFIRMED.